**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA**

| | | |
|---|---|---|
| In re: | ) | |
|     New Beginnings Care, LLC | ) | Case No. 16-10272 NWW |
|     Abbeville Healthcare & Rehab, LLC | ) | Case No. 16-10273 SDR |
|     Campus Healthcare & Rehab, LLC | ) | Case No. 16-10275 NWW |
|     Cedarcreek Healthcare & Rehab, LLC | ) | Case No. 16-10276 SDR |
|     Eastman Healthcare & Rehab, LLC | ) | Case No. 16-10277 SDR |
|     Edwards Redeemer Healthcare & Rehab, LLC | ) | Case No. 16-10278 NWW |
|     Goodwill Healthcare & Rehab, LLC | ) | Case No. 16-10279 NWW |
|     Jeffersonville Healthcare & Rehab, LLC | ) | Case No. 16-10280 NWW |
|     Mt Pleasant Healthcare & Rehab, LLC | ) | Case No. 16-10282 SDR |
|     Oceanside Healthcare & Rehab, LLC | ) | Case No. 16-10283 SDR |
|     Pinewood Healthcare & Rehab, LLC | ) | Case No. 16-10284 SDR |
|     Rockmart Healthcare & Rehab, LLC | ) | Case No. 16-10285 SDR |
|     Savannah Beach Healthcare & Rehab, LLC | ) | Case No. 16-10286 SDR |
|     Woodlands Healthcare & Rehab, LLC | ) | Case No. 16-10287 SDR |
| | ) | |
|     Debtors. | ) | Chapter 11 |
| | ) | Jointly Administered Requested |

_____

**DEBTORS' EXPEDITED MOTION FOR AN ORDER AUTHORIZING DEBTORS TO PAY PRE-PETITION CLAIMS OF CERTAIN CRITICAL TRADE VENDORS**
_____

NOTICE OF HEARING

Notice is hereby given:

    That a hearing will be held in the Third Floor Courtroom A, Historic Post Office and Courthouse, 31 East 11th Street, Chattanooga, Tennessee 37402, on January 26, 2016, at 10:00 a.m., on this Motion.

**If you do not want the court to grant the relief requested, you or your attorney must attend this hearing. If you do not attend the hearing, the court may decide that you do not oppose the relief sought in the motion and may enter an order granting that relief.**

    New Beginnings Care, LLC; Abbeville Healthcare & Rehab, LLC; Campus Healthcare & Rehab, LLC; Cedarcreek Healthcare & Rehab, LLC; Eastman Healthcare & Rehab, LLC; Edwards Redeemer Healthcare & Rehab, LLC; Goodwill Healthcare & Rehab, LLC;

1

Jeffersonville Healthcare & Rehab, LLC; Mt Pleasant Healthcare & Rehab, LLC; Oceanside Healthcare & Rehab, LLC; Pinewood Healthcare & Rehab, LLC; Rockmart Healthcare & Rehab, LLC; Savannah Beach Healthcare & Rehab, LLC; and Woodlands Healthcare & Rehab, LLC; each a Debtor-in-Possession (collectively, the "Debtors"), pursuant to Sections 105(a), 363(b) and 364 of Title 11 of the United States Code (the "Bankruptcy Code"), hereby move this Court for entry of an order authorizing the Debtors to pay the pre-petition claims of certain critical trade vendors (the "Motion"). In support of this Motion, the Debtors represent as follows:

## SUMMARY OF RELIEF REQUESTED

The Debtors seek authority to pay the pre-petition claims of certain limited "critical vendors." As set forth more fully herein, the vast majority of these claims are claims of vendors who are the Debtors' only sources or practical sources of the goods and services provided to Debtors' business. These are vendors who provide essential services, or other goods to the Debtors that cannot be replaced without significant risk and cost to the Debtors and their estates. The Debtors believe that, absent payment of their pre-petition claim or a portion thereof, these critical vendors are unlikely to continue providing essential goods and services to the Debtors after the commencement of these Chapter 11 cases. In light of the foregoing, the relief requested herein is crucial to the Debtors' continued operations, is essential to their successful reorganization, and is in the best interest of the Debtors' estates.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BACKGROUND

2. On January 22, 2016, (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Tennessee, Southern Division (the "Court").

3. The Debtors have continued in possession of their properties and have continued to operate and manage their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in these cases.

4. The management company and the 13 nursing home limited liability companies are equally owned by Debbie Jones and Trent Tolbert.

5. The Debtors conduct their operations from 13 leased facilities located in Georgia, Tennessee, and Ohio. The Debtors' management company is located in Chattanooga, Tennessee. The Debtors have approximately 1,300 employees; and over 800 nursing home residents. Debtors' primary secured lender is Gemino Healthcare Finance, Inc. ("Gemino") which is owed in excess of $2,000,000, which debt is secured by Debtors' receivables. Debtors owe state and federal taxing authorities, delinquent rent, and unsecured trade debt in excess of $7,000,000. Debtors' gross revenue for 2015 were in excess of $63,000,000.

6. The Debtors' Chapter 11s were necessitated as the state of Georgia has been withholding $76,000 per week starting in April, 2015, from Debtors' weekly Georgia Medicaid payments. In November, 2015, they started withholding an additional $40,000 per week until the end of January, 2016, when Debtors are expected to pay the total outstanding balance of over $3,000,000 to bring the bed taxes current in Georgia. Debtors' Accounts Receivable ("AR") lender, Gemino, is not including Georgia Medicaid in the borrowing base due to the outstanding bed taxes in the state. Debtors are having over $464,000 withheld, and in months with 5

3

Tuesdays, Debtors are having over $581,000 withheld. As a result of this, Debtors have over $1,200,000 at any point in time that Gemino is not letting Debtors borrow on because of the outstanding bed taxes.

7. In Ohio, Debtors are having 100% recoupment of Debtors' Medicaid money in order to pay back bed taxes. This is approximately $13,000 per week from each of the two facilities. On a monthly basis this is another $104,000 per month that Debtors are not getting in payments from the state of Ohio. In addition to this, Debtors are not able to borrow against this outstanding AR due to Gemino reserving against these Medicaid claims. This is over $34,000 that we are not able to borrow against each week.

8. Tennessee is not recouping Debtors' funds yet but the AR lender is not allowing the Tennessee Medicaid receipts to be included in the borrowing base which is approximately $100,000 at any point in time due to the outstanding bed taxes in Tennessee.

9. Overall Debtors have $3,541,000 in Medicaid money and the amount Debtors are able to borrow against is $170,000, so Debtors are unable to borrow against over $3,500,000 of outstanding AR for Medicaid.

10. Debtors also have patients that are pending Medicaid approval. Debtors have been providing these services to these patients with no reimbursement. Debtors are not able to borrow against this AR until the residents are approved. This total amount of Medicaid pending AR is $2,161,000 and only $7,000 is made available on Debtors' borrowing base.

### RELIEF REQUESTED

11. The Debtors seek authority to pay, in their sole discretion, undisputed pre-petition claims (the "Critical Vendor Claims") of two critical vendors (the "Critical Vendors"), in the amount of approximately $100,000, more or less. As set forth more fully below, due to the unique operations of the Debtors, payment of the Critical Vendor Claims are vital to the Debtors'

reorganization efforts because (i) the Critical Vendors are the only source from which the Debtors can procure particular goods or services with the proper qualifications and time frame required, (ii) in certain circumstances, supplies or services can only be supplied by original equipment manufacturers or parties that hold intellectual property rights to the services or goods, (iii) failure to pay the Critical Vendor Claims would, in the business judgment of the Debtors, result in the Critical Vendors refusing to provide goods and/or services to the Debtors and (iv) interruption of the foregoing would result in the shutdown of operations.

12. If the Debtors are not authorized to pay the Critical Vendor Claims, the Debtors are not aware of any legal ability to compel this vendor to continue to do business and/or provides its unique goods or services. In such event, if the Critical Vendors cease providing services and goods to the Debtors, the Debtors will be unable to conduct their business.

### PAYMENT OF THE CRITICAL VENDOR CLAIM

13. Based on the Debtors' books and records, as of the Petition Date, the total number of vendors with pre-petition amounts owing from the Debtors is in excess of 1,300. Of this amount, the Debtors estimate that only two (2) vendors constitute a Critical Vendor. The Debtors seek authority to pay up to $100,000 (the "Critical Vendor Cap"). Because of the critical nature of Critical Vendors' goods and services, the Critical Vender Cap constitutes an insignificant percentage of the Debtors' total tax and trade-related liabilities as of the Petition Date.

A. **Procedures for Identifying "Critical Vendors"**

14. The Debtors have critically examined whether the payments on account of Critical Vendor Claims described herein are necessary in order to avoid irreparable harm to their operations and thus their reorganization effort and whether such payments will ensure that the Debtors will have access to adequate amounts of services and supplies on

5

a post-petition basis. Specifically, the Debtors have undertaken a thorough review of their accounts payable and their list of pre-petition vendors to identify those vendors which are essential to the Debtors' operations. In addition, the Debtors have developed certain procedures, described more fully below, that will ensure that vendors receiving payment for Critical Vendor Claims will continue to supply trade credit necessary to the Debtors' businesses on a post-petition basis.

15. In determining which claims to pay pursuant to this Motion, the Debtors consulted with their administrators, nursing professionals and accountants for each of their facilities and others throughout the Debtors' management and purchasing operations to identify those trade vendors that are essential for the continued operation of its facilities and the uninterrupted business of its management company. In making this determination, the Debtors considered several factors as to whether vendors should be included as a Critical Vendor including as follows:

(a) Third Party Products and Services: the Debtors either are the exclusive recipient of proprietary products and/or use proprietary products in aspects of their business. In either event, there is no alternative supply or supplier and it is critical to continue uninterrupted nursing home services that these vendors get paid.

16. The Debtors have factored all the above in determining the likelihood that failure to pay a Critical Vendor's claims would result in the Critical Vendor terminating its provision of goods and/or services to the Debtors. The Critical Vendor falls within at least one of the foregoing categories.

17. Debtors have identified Think Anew as a Critical Vendor. Think Anew owns the Debtors software and internet services, leases the Debtors' phone systems to them and provides voice over IP with Debtors. All of Debtors resident charting is hosted by this company. Think

Anew owns Debtors' certain equipment such as their phone systems, computers, IT equipment in the IT closets at all facilities including the managing company's headquarters in Chattanooga. The company has blocked access by the Debtors to the internet and otherwise blocked Debtors use of its software. If this use is not immediately reinstated, the Debtors will be out of business.

18. Debtors have identified Point Quick Care a/k/a Wescom Solutions as a Critical Vendor. Quick Care handles all of the Debtors' patient data, billing, and collections and accounting and financial reporting software. Without this Vendor, Debtors cannot provide care to residents or do any reporting to the Bankruptcy Court.

B.   **The Trade Agreements and Related Procedures**

19.   The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of each of the Critical Vendors to the terms and conditions set forth in a letter agreement, substantially in the form attached hereto as Exhibit A (the "Trade Agreement"). The Trade Agreement format is premised on the following terms and conditions, among others:

(a)   The amount of such Critical Vendor's estimated pre-petition trade claims, accounting for any setoffs, other credits and discounts thereto, shall be as mutually determined in good faith by the Critical Vendor and the Debtors (but such amount shall be used only for the purposes of this Order and shall not be deemed a Claim allowed by the Court and the rights of all interested persons to object to such Claim shall be fully preserved until further order of the Court);

(b)   The Critical Vendor agrees to be bound by, and provide goods and services under, the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), which were in effect between such Critical Vendor and the Debtors on a historical basis and the Debtors' agree to pay in accordance with such terms;

(c)   The Critical Vendor agrees not to file or otherwise assert against any or all of the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining pre-petition amounts allegedly owed to the Critical Vendor by the Debtors arising from agreements entered into prior to the Petition Date, and that, to the extent that the Critical Vendor has previously obtained such a Lien, the

        Critical Vendor shall immediately take all necessary actions to remove such Lien;

(d)     The Critical Vendor acknowledges that it has reviewed the terms and provisions of the order approving the Motion and consents to be bound hereby;

(e)     The Critical Vendor agrees that it will not separately assert or otherwise seek payment for reclamation claims outside of the terms of the order granting this Motion unless the Critical Vendor's participation in the trade payment program authorized by the order granting this Motion is terminated;

(f)     If either the trade payment program or the Critical Vendor's participation therein terminates, any payments received by the Critical Vendor on account of such Critical Vendor's prepetition claim will be deemed to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor and that such Critical Vendor shall immediately repay to the Debtors any payments made to it on account of its prepetition claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise; and

(g)     If the Critical Vendor has obtained personal or inter corporate guarantees guaranteeing payment of any sums due Critical Vendor, Critical Vendor agrees not to pursue collection of those guarantees until the Plan is confirmed in this Case, the Case is converted to Chapter 7 or the Case is dismissed.

20.    The Debtors seek authority to enter into such Trade Agreements, if and at the time when the Debtors determine in their discretion that such an agreement is necessary to their postpetition operations.

21.    The Debtors reserve the right to negotiate trade terms with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, that vary that from the Customary Trade Terms to the extent the Debtors determine that such terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estates (the "Negotiated Trade Terms"). Such authority will only be exercised by the Debtors if the Debtors determine, in their business judgment, that failure to pay the Critical Vendor Claim is likely to result in irreparable harm to the Debtors' business operations.

22.    The Debtors further propose that, if a Critical Vendor refuses to supply goods

and/or services to the Debtors on Customary Trade Terms following receipt of payment of its Critical Vendor Claim, or fails to comply with any Trade Agreement entered into between such Critical Vendor and the Debtors, the Debtors shall be permitted, in their discretion and without further order of the Court, to (i) declare that any Trade Agreement between the Debtors and such Critical Vendor is terminated (if applicable), and (ii) declare that provisional payments made to Critical Vendor on account of Critical Vendor Claims, whether pursuant to a Trade Agreement or otherwise, be deemed to have been in payment of then-outstanding postpetition claims of such vendors. In the event the Debtors exercise either of the foregoing rights, the Critical Vendor against which such rights are exercised shall immediately return to the Debtors any payments made to it on account of its Critical Vendor Claim, to the extent that any such payments exceed the postpetition claims of such vendor then outstanding (without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or otherwise).

23. The Debtors propose that any Trade Agreement which has been terminated in accordance with its terms may be reinstated if:

(a) The termination is subsequently reversed by the Court, after notice and a hearing following a motion by the Critical Vendor, for good cause shown that the termination was materially incorrect; or

(b) The underlying default under the Trade Agreement was fully cured by the Critical Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor that a default had occurred; [or

(c) The Debtors, in their discretion, reach a favorable alternative agreement with the Critical Vendor.

24. Finally, the Debtors propose that checks used to pay Critical Vendor Claims contain a legend or be accompanied by a letter substantially in the following form:

> Acceptance of this check is subject to the Order of the U.S. Bankruptcy Court for the Eastern District of Tennessee, dated January 26, 2016, Case No. [16-10272 NWW]

**LEGAL BASIS FOR REQUESTED RELIEF**

25.  Although the Sixth Circuit appellate court has not addressed the question of whether a debtor should be authorized to make pre-petition payments to its critical vendors, courts in this circuit have approved such payments. *See, e.g., In re Go Logistics, Inc.,* Case No. 07-26324 (Bankr. W.D. Tenn. July 23, 2007); *In re Amcast Indus. Corp.,* Case No. 04-40504 (Dec. 28, 2004); *In re Nexpak Corp.,* Case No. 04-63816 (Bankr. N.D. Ohio July 19, 2004); *In re: Pen Holdings, Inc.,* Case No. 302-00979 (Bankr. W.D. Tenn. Jan. 31, 2002); *In re Eagle-Pitcher Indus., Inc.,* 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991).

26.  In addition, courts in other districts have consistently granted such relief in cases with facts similar to those at issue in this case. *See, e.g., In re Dura Auto. Sys., Inc.,* No. 06-11202 (Bankr. D. Del. Nov. 20, 2006); *In re Delta Air Lines, Inc.,* No. 05-17923 (Bankr. S.D.N.Y. Sept. 16, 2005); *In re Calpine Corp.,* Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005); *In re Nat'l Equip. Servs., Inc.,* Case No. 03-27626 (PSH) (Bankr. N.D. Ill., July 1, 2003); *In re Hayes Lemmerz Int'l, Inc.,* Case No. 01-11490 (MFW) (Bankr. D. Del., Dec. 21, 2001). As set forth more fully below, the basis for approval of such payments can be found in sections 363, 364 and 105(a) of the Bankruptcy Code.

**A.   This Court May Authorize Payment of the Critical Vendor
       Claims Pursuant to Sections 364 and 363 of the Bankruptcy Code**

27.  The relief requested in this Motion is authorized pursuant to sections 364 and 363(b) of the Bankruptcy Code. *See, e.g., In re New World Pasta,* Case No. 04-02817 (Bankr. M.D. Pa. May 10, 2004) (authorizing payments to vendors under sections 105(a), 363, 364 and 365); *In re UAL Corp., et al.,* Case No. 02-48191 (ERW) (Bankr. N.D. Ill. December 11, 2002) (authorizing critical vendor payments under sections 363 and 364); *In re Conseco, Inc., et al.,* Case No. 02-49672 (CAD) (Bankr. N.D. Ill. Jan. 14, 2003) (authorizing critical vendor payments

under section 363).

28. By agreeing to the Customary Trade Terms, the Critical Vendors are extending unsecured credit to the Debtors. Bankruptcy Code section 364(b) allows a court to authorize a debtor to obtain unsecured credit after the commencement of its chapter 11 case. *See* 11 U.S.C. § 364(b). Such credit may be undertaken where, among other things, approval of the borrowing is critical to the debtor's business. *In re Payless Cashways, Inc.,* 268 B.R. 543, 547 (Bankr. W.D. MO. 2001). This is certainly the case here, where the Debtors' continued access to raw materials that are supplied only by the Critical Vendors would otherwise be in jeopardy. If the Critical Vendors do not continue to deliver such materials to the Debtors on a timely basis, the Debtors will be unable to continue their manufacturing operations and will likely be forced to shutdown their plants.

29. The requested relief is also supported by section 363(b)(1) of the Bankruptcy Code, which authorizes a court, after notice and a hearing, to permit a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "[S]atisfaction of a pre-petition debt in order to keep 'critical' supplies flowing is a use of property other than in the ordinary course of administering an estate in bankruptcy," and thus is within the scope of the statute's language. *In re Kmart Corp.,* 359 F.3d 866, 872 (7th Cir. 2004). In at least one case, the court has held that the "critical" standard is satisfied if (i) the creditors whose claims are to be paid will cease dealing with the debtor if not immediately paid for pre-petition goods and services and (ii) payment will not adversely affect the debtor's other creditors. *!d.* at 868.

30. There is no question that the payments are "critical" to the Debtors in this case. As described herein, the Debtors have undertaken a thorough analysis and have determined that (i) the Critical Vendors are vital to the Debtors' businesses, and (ii) there is a significant risk that

such vendors will cease doing business with the Debtors unless they receive some payment on account of their pre-petition claims. If the Critical Vendors refuse to continue to provide goods and/or services to the Debtors, the effect would be devastating to the Debtors' operations -- and would cost the estates and their creditors far more than the costs associated with the payments proposed herein. Thus, the Debtors' other creditors will be no worse off, and in fact will fare far better, if the Debtors are empowered to negotiate the Trade Agreements. In light of the foregoing, the proposed payments to the Critical Vendors are in the best interests of the Debtors' creditors and are consistent with section 363(b) of the Bankruptcy Code.

**B.     The Court May Also Rely Section lOS(a) to Grant the Relief Requested**

31.    The Court's equitable powers under section 105(a) of the Bankruptcy Code provides further support for the relief requested herein. Section 1OS(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 1OS(a). The purpose of this provision is "to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." *See 2 Collier on Bankruptcy* 105.01 (15th ed. rev. 2003). Thus, Section 105 of the Bankruptcy Code essentially codifies the Bankruptcy Court's inherent equitable powers. Numerous courts have applied such equitable powers under the "necessity of payment doctrine" to authorize payment of a debtor's pre-petition obligations where, as here, such payment is necessary to the continued operations of the debtor and to its successful reorganization. *See, e.g., In re Eagle-Pitcher Indus., Inc.,* 124 B.R. at 1023. In light of the foregoing, the relief requested in this Motion is justified under section 105(a) of the Bankruptcy Code.

For the foregoing reasons, the Debtors believe that granting the relief requested herein

is appropriate and in the best interests of their estates.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Debtors request this Court enter the annexed order and grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 24th day of January, 2016.

                        SCARBOROUGH & FULTON

                By:   /s/David J. Fulton
                      David J. Fulton, #006102
                      701 Market Street, Suite 1000
                      Chattanooga, Tennessee 37402
                      (423) 648-1880
                      (423) 648-1881 (facsimile)
                      DJF@sfglegal.com

## CERTIFICATE OF SERVICE

      The undersigned certifies that a copy of this Motion was served in order of preference by email, fax or overnight delivery with sufficient postage to carry it to its destination, dated this 24th day of January, 2016.

      United States Trustee
      Ustpregion08.cn.ecf@usdoj.gov

      U.S. Attorney
      USATNE.ECFChattBK@usdoj.gov

      30 largest unsecured creditors

      Gemino Healthcare Finance
      c/o Stacy Allen
      1 International Plaza, Ste 220
      Philadelphia, PA 19113
      stacy.allen@gemino.com

      By:    /s/David J. Fulton
               David J. Fulton